AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2018 FEB 27 AM 10: 59

U.S. DISTRICT COURT

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

36 VIRGINIA AVENUE, DAYTON, OHIO, 45410
(including all outbuildings, curtilage, and vehicles parked on the premises)

)
)
)
)
)
)

Case No.  3:18 mj 139

MICHAEL J. NEWMAN

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment C-1 | |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Andrea R Kinzig_

*Applicant's signature*

Andrea R. Kinzig, Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

Date:  2/27/18

_Michael Newman_

*Judge's signature*

City and state:  Dayton, Ohio

Michael J. Newman, U.S. Magistrate Judge

*Printed name and title*

**ATTACHMENT A-1**

36 VIRGINIA AVENUE, DAYTON, OHIO, 45410 ("SUBJECT PREMISES"), is a single family, two-story residence with yellow stucco surrounding the first story and white siding surrounding the second story. The street address numbers are black in color and affixed to the residence to the left of the front door. There is a two-car detached garage at the rear of the property, which can be accessed from an alley behind the property. The SUBJECT PREMISES is located on the east side of Virginia Avenue between Heaton Avenue and Wyoming Street. The SUBJECT PREMISES includes all outbuildings, curtilage, and vehicles parked on the property of the SUBJECT PREMISES.



## ATTACHMENT B-1

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of offenses involving violations 18 U.S.C. § 2 (aiding and abetting), 18 U.S.C. § 924(c) (use of a firearm during and relation to a crime of violence), 18 U.S.C. § 922(d) (sale or transfer of a firearm to a prohibited person), 18 U.S.C. § 922(g) (possession of a firearm by a prohibited person), 18 U.S.C. § 1512 (tampering with a witness, victim, or informant), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 373 (solicitation to commit an offense), 18 U.S.C. § 1073 (unlawful flight to avoid prosecution), 18 U.S.C. § 1071 (concealing a person from arrest), and 18 U.S.C. § 2261A (stalking), involving Sterling Roberts, Tawnney Caldwell (also known as Tawnney Thomas), Chandra Harmon, James Harmon, Chance Deakin, Christopher Roberts, and others unknown from January 1, 2017 to the present, including:

*Computer Devices:*

1. Desktop computers, laptops, iPads, tablets, cellular telephones, digital cameras, and any attached electronic storage devices such as thumb drives, external hard drives, CD's, DVD's, and SD cards (to include the electronic contents of these items).

2. The authorization includes the search of electronic data to include deleted data, remnant data and slack space. The authorization also includes the search of the computer hardware and computer software.

*Electronic Records:*

3. Any communications regarding the planning, execution, and/or concealment of the murder or attempted murder of Robert Caldwell;

4. Any communications about Robert Caldwell;

5. Any communications regarding Sterling Roberts' whereabouts after the homicide of Robert Caldwell or concealing Sterling Roberts' whereabouts;

6. Any communications regarding the custody of Tawnney Caldwell's and Robert Caldwell's children;

7. Any communications with or about Tawnney Caldwell's and Robert Caldwell's children;

8. Any communications regarding the possession, acquisition, and use firearms;

9. Any communications regarding the destruction of evidence;

10. Any communications regarding the intimidation of witnesses to events surrounding the homicide of Robert Caldwell;

11.  Any contact / identifying information for individuals involved in the communications about the above noted offenses;

12.  Any Internet searches regarding Robert Caldwell;

13.  Any Internet searches regarding the possession, acquisition, and use of firearms;

14.  Any Internet searches for cellular telephones, vehicles, and other instrumentalities used in the commission of the homicide or attempted homicide of Robert Caldwell;

15.  Information related to purchases of cellular telephones, vehicles, firearms, and other instrumentalities used in the homicide or attempted homicide of Robert Caldwell;

16.  Itineraries and receipts from airlines, hotels, and travel agencies and/or other documents reflective of travel;

17.  Financial statements, banking information, and other financial documents;

18.  Information regarding the use of social media accounts and other email accounts;

19.  Any maps, directions, GPS information, IP addresses, and other location information related to the execution of the above noted offenses;

20.  Any images and/or videos depicting Robert Caldwell;

21.  Any images and/or videos depicting cellular telephones, vehicles, firearms, and other instrumentalities used in the homicide or attempted homicide of Robert Caldwell;

22.  Any images and/or videos depicting the surroundings where the above noted criminal activities transpired;

23.  Any cellular telephone data backed up to computers and laptops which contains evidence of the above noted communications and information;

24.  Any information related to the identity of the user(s) of the computers, laptops, iPads, tablets, and cellular telephones;

*Firearms and Ammunition*

25.  Firearms and ammunition;

26.  Documents related to the purchase and acquisition of firearms and ammunition;

27.    Gun boxes, gun holsters, magazines, and other firearm accessories;

*Other Items*:

28.    Telephone bills and other telephone records;

29.    Documents and records regarding the ownership and/or possession of the items seized from the SUBJECT PREMISES;

30.    During the course of the search, photographs of the SUBJECT PREMISES may also be taken to record the condition thereof and/or the location of items seized from the residence.

## **ATTACHMENT C-1**

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2 | Aiding and Abetting |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 373 | Solicitation to Commit an Offense |
| 18 U.S.C. § 924(c) | Use of a Firearm During and in Relation of a Crime of Violence |
| 18 U.S.C. § 922(d) | Sale or Transfer of a Firearm to a Prohibited Person |
| 18 U.S.C. § 922(g) | Possession of a Firearm by a Prohibited Person |
| 18 U.S.C. § 1071 | Concealing a Person from Arrest |
| 18 U.S.C. § 1073 | Unlawful Flight to Avoid Prosecution |
| 18 U.S.C. § 1512 | Tampering with a Witness, Victim, or Informant |
| 18 U.S.C. § 2261A | Stalking |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Andrea R. Kinzig, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since 2005.  I am currently assigned to the Dayton, Ohio Resident Agency of the Cincinnati Field Office.  In connection with my official duties, I investigate violations of federal criminal laws, including offenses pertaining to stalking, firearms, witness intimidation, and conspiracy.

2.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of:

a.      18 U.S.C. § 2 (aiding and abetting)

b.      18 U.S.C. § 371 (conspiracy),

c.      18 U.S.C. § 373 (solicitation to commit an offense),

d.      18 U.S.C. § 922(d) (sale or transfer of a firearm to a prohibited person),

e.      18 U.S.C. § 922(g) (possession of a firearm by a prohibited person),

f.      18 U.S.C. § 924(c) (use of a firearm during and in relation to a crime of violence),

g.      18 U.S.C. § 1071 (concealing a person from arrest),

h.      18 U.S.C. § 1073 (unlawful flight to avoid prosecution),

i.      18 U.S.C. § 1512 (tampering with a witness, victim, or informant), and

j.      18 U.S.C. § 2261A (stalking),

have been committed by STERLING ROBERTS, TAWNNEY CALDWELL (also known as TAWNNEY THOMAS), CHANDRA HARMON, JAMES HARMON, CHANCE DEAKIN

(also known as CHANCE ROBERTS), and CHRISTOPHER ROBERTS. This Affidavit is submitted in support of Applications for Search Warrants for the following:

    a.    Residential property located at 36 Virginia Avenue, Dayton, Ohio, 45410 (hereinafter referred to as **SUBJECT PREMISES** and more fully described in Attachment A-1 hereto);

    b.    The person of **CHANCE DEAKIN**, also known as **CHANCE ROBERTS**, date of birth July 20, 1992 (more fully described in Attachment A-2 hereto);

    c.    The person of **CHRISTOPHER ROBERTS**, date of birth December 4, 1987 (more fully described in Attachment A-3 hereto).

3.    This Affidavit is submitted in support of Applications for search warrants for the **SUBJECT PREMISES,** the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS**, and the computer(s) located at the **SUBJECT PREMISES** and on the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS**. The items to be searched for and seized are described more particularly in Attachments B-1 through B-3 hereto.

4.    As part of the investigation, I have reviewed documentation and reports provided by and discussed information with other agents, officers, and investigators involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

5.    This Affidavit does not contain every fact known to the investigation, but only those deemed necessary to demonstrate sufficient probable cause to support the searches of the **SUBJECT PREMISES,** the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS,** and the computer(s) located at the **SUBJECT PREMISES** and on the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS**.

6.    As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law,

2

including 18 U.S.C. §§ 2, 371, 373, 922(d), 922(g), 924(c), 1071, 1073, 1512, and 2261A, are present at the **SUBJECT PREMISES**, on the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS**, and on the computer(s) located at the **SUBJECT PREMISES** and on the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS**.

## PROBABLE CAUSE

7.     Along with other agents and officers of the Riverside (Ohio) Police Department, Sugarcreek Township (Ohio) Police Department, and FBI, I am currently involved in an investigation of stalking, weapons and other related offenses committed by STERLING ROBERTS, TAWNNEY CALDWELL (also known as TAWNNEY THOMAS), CHANDRA HARMON, JAMES HARMON, **CHANCE DEAKIN** (also known as **CHANCE ROBERTS**), **CHRISTOPHER ROBERTS,** and others unknown.  The offenses relate to events surrounding the homicide of ROBERT CALDWELL on August 15, 2017 in Riverside, Ohio.

8.     On August 15, 2017, at approximately 5:57 p.m., ROBERT CALDWELL and his three minor children left a counseling appointment at 4134 Linden Avenue in Riverside, Ohio. While crossing the parking lot, ROBERT CALDWELL was shot multiple times by an assailant in front of his children.  ROBERT CALDWELL died at the scene.  As detailed below, the assailant was later identified as STERLING ROBERTS.  Based on the investigation conducted to-date, as detailed below, there is probable cause to believe that STERLING ROBERTS, TAWNNEY CALDWELL, CHANDRA HARMON, JAMES HARMON, **CHANCE DEAKIN**, and **CHRISTOPHER ROBERTS** conspired together to plan, execute, and/or cover-up the violent crime resulting in the death of ROBERT CALDWELL.  The conspiracy includes but is not limited to obtaining weapons, vehicles, cellular telephones, and other instrumentalities used before, during, and after the crime; concealing STERLING ROBERTS' whereabouts; assisting STERLING ROBERTS in fleeing to avoid prosecution; destroying or attempting to destroy

3

evidence; and intimidating or tampering with a witnesses. In carrying out the conspiracy, some of the co-conspirators traveled interstate and/or assisted others in interstate travels.

9. By way of background, below is a summary of the relationships of the aforementioned individuals:

a. ROBERT CALDWELL and TAWNNEY CALDWELL were married in approximately 2009. They had three children together, who will be referred to for purposes of this Affidavit as "Minor Male A", age 15; "Minor Male B", age 14; and "Minor Male C", age 9. ROBERT CALDWELL and TAWNNEY CALDWELL were divorced in 2012. At that time, TAWNNEY CALDWELL was designated as the custodial and residential parent of the three minor children, and ROBERT CALDWELL was awarded visitation rights. TAWNNEY CALDWELL currently resides at 2006 Washington Creek Lane in Centerville, Ohio.

b. From approximately 2013 to the present, TAWNNEY CALDWELL had a romantic relationship with STERLING ROBERTS. They had two biological daughters together (one of whom was born in December 2017) and sometimes lived together at TAWNNEY CALDWELL's residence in Centerville, Ohio.

c. **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS** are STERLING ROBERTS' brothers. They currently reside at the **SUBJECT PREMISES**.

d. CHANDRA HARMON is TAWNNEY CALDWELL's mother. CHANDRA HARMON is married to JAMES HARMON, and they currently reside together at 6278 Rogers Lane in Burlington, Kentucky.

e. JEANINE ROBERTS is the mother of STERLING ROBERTS, **CHANCE DEAKIN**, and **CHRISTOPHER ROBERTS**. She currently resides in Nashville, Tennessee.

10. Also by way of background, STERLING ROBERTS and **CHRISTOPHER ROBERTS** have previously been convicted of felony offenses punishable by a term of imprisonment exceeding one year. As such, they are prohibited from possessing firearms. Below is a summary of their felony convictions:

a. On or around October 2, 2008, **CHRISTOPHER ROBERTS** pled guilty in the Montgomery County, Ohio Court of Common Pleas to one count of Aggravated Possession of Drugs, in violation of Ohio Revised Code (O.R.C.) Section 2925.11(A); and one count of Aggravated Trafficking of Drugs, in violation of

4

O.R.C. 2925.03(A)(1) (pursuant to case 2008CR02789). He was sentenced to five years community control for both counts, to be served concurrently.

b.    On or around September 5, 2003, STERLING ROBERTS pled guilty in the Greene County, Ohio Court of Common Pleas to one count of Burglary, in violation of O.R.C. Section 2911.12(A)(4); and one count of Misdemeanor Assault, in violation of O.R.C. Section 2903.13(A) (pursuant to case 2003CR0427). He was sentenced to twelve months confinement for the Burglary offense and six months confinement for the Assault offense, to be served concurrently.

c.    On or around July 25, 2006, STERLING ROBERTS pled guilty in the Montgomery County, Ohio Court of Common Pleas to one count of Burglary, in violation of O.R.C. Section 2911.12(a)(3) (pursuant to case 2006CR00097). He was sentenced to five years community control.

d.    On or around January 7, 2009, STERLING ROBERTS pled guilty in the Montgomery County, Ohio Court of Common Pleas to one count of Illegal Processing of a Drug Document, in violation of O.R.C. Section 2925.23(B)(1) (pursuant to case 2008CR02421). He was sentenced to nine months confinement.

e.    On or around May 4, 2012, STERLING ROBERTS pled guilty in the Montgomery County, Ohio Court of Common Pleas to one count of Deception to Obtain Dangerous Drugs, in violation of O.R.C. Section 2925.22A; one count of Forgery (Uttering), in violation of O.R.C. Section 2913.31(A)(3); and one count Engaging in Pattern of Corrupt Activity, in violation of O.R.C. Section 2823.32(a)(1) (pursuant to case 2011CR03274). He was sentenced to eighteen months confinement for the Deception offense, two years confinement for the Forgery offense, and twelve months confinement for the Pattern of Corrupt Activity offense, all to be served concurrently.

f.    On or around May 17, 2017, STERLING ROBERTS pled guilty in the Montgomery County, Ohio Court of Common Pleas to one count of Having Weapons While Under Disability (Prior Offense of Violence), in violation of O.R.C. Section 2923.13(A)(2) (pursuant to case 2017CR00274). He was sentenced to five years of probation.

11.    Beginning in or around 2013, there has been an ongoing dispute between ROBERT CALDWELL and TAWNNEY CALDWELL regarding the custody of their three children. The dispute was litigated in the Montgomery County, Ohio Common Pleas Court, Division of Domestic Relations. ROBERT CALDWELL has filed motions over the years alleging that TAWNNEY CALDWELL has consistently interfered with his parental rights. The

Magistrate Judge found TAWNNEY CALDWELL in contempt of court on two occasions for interfering with ROBERT CALDWELL's parental rights. TAWNNEY CALDWELL has also filed motions where she alleged that the children were not adjusting well to ROBERT CALDWELL as a parent, were doing poorly in school, and were unhappy. TAWNNEY CALDWELL also alleged that ROBERT CALDWELL was abusing the children. These issues were examined during a hearing on or around May 10, 2017, and were determined to be unfounded by the Magistrate Judge.

12. After STERLING ROBERTS was arrested for firearms offenses in April 2017 (related to his conviction for Having Weapons While Under Disability pursuant to case 2017CR00274, as detailed above), ROBERT CALDWELL brought STERLING ROBERTS' criminal history and drug usage to the attention of the Magistrate Judge. On or around May 2, 2017, the Magistrate Judge ordered that TAWNNEY CALDWELL not allow STERLING ROBERTS to be "in the presence or vicinity of the minor children nor shall he be allowed to have any contact with the minor children".

13. Despite the order from the Magistrate Judge, TAWNNEY CALDWELL, her three children, and STERLING ROBERTS traveled to Florida together around early May 2017. ROBERT CALDWELL found out about the trip after seeing pictures posted on TAWNNEY CALDWELL's Facebook social media account, and he filed a motion requesting full custody of his children on or around May 10, 2017. A hearing was held before the Magistrate Judge where evidence was presented on this issue as well as TAWNNEY CALDWELL's persistent interference with ROBERT CALDWELL's visitation rights. During the hearing, TAWNNEY CALDWELL lied while under oath about the trip she took with STERLING ROBERTS. She admitted during testimony at a later hearing that she had in fact lied about her contact with STERLING ROBERTS.

14.     During the summer of 2017, ROBERT CALDWELL was supposed to receive a 30-day block of parenting time with his children based on the recommendation of a court-appointed Guardian Ad Litem. A few days after the children were transferred to ROBERT CALDWELL's custody for this 30-day period, all three children ran away from the home and went to TAWNNEY CALDWELL's residence. It was determined that the children utilized an Uber[1] application that had been downloaded onto their cellular telephone(s) and paid for with TAWNNEY CALDWELL's debit card to travel to TAWNNEY CALDWELL's residence.

15.     In an order filed on or around July 29, 2017, the Magistrate Judge designated ROBERT CALDWELL as the custodial and residential parent for the three children. The Magistrate Judge noted in the order that TAWNNEY CALDWELL lacked credibility and failed to demonstrate a "willingness or ability to actually facilitate parenting time" with ROBERT CALDWELL and "is at worst absent and at best simply not up to the job at hand". Furthermore, the Magistrate Judge reiterated the previous order that STERLING ROBERTS should not have contact with the children.

16.     In July 2017, ROBERT CALDWELL began receiving harassing messages on his personal Facebook social media website from STERLING ROBERTS. ROBERT CALDWELL reported these messages to the attorney representing him in the custody dispute.

17.     Records received from First Choice Auto in Middletown, Ohio revealed that TAWNNEY CALDWELL purchased a grey 2003 Mitsubishi Eclipse on or around July 27, 2017. The salesman for the transaction identified that a man resembling STERLING ROBERTS in appearance was with TAWNNEY CALDWELL when she made the purchase, and that he

---

[1]Uber is a car transportation and food delivery application available on mobile devices. It is operated by Uber Technologies Inc., which is headquartered in San Francisco, California. The application requires use of a mobile device to book the transportation services and offers "upfront pricing".

drove the vehicle when they left the store. The vehicle was paid for in part with a Chase Bank

Visa debit card in TAWNNEY CALDWELL's name, with the remainder paid for in cash.

18.    Records received from TracFone and T-Mobile revealed that a cellular telephone

bearing telephone number 937-825-5688 was activated on or around July 29, 2017 (hereinafter

referred to as "*Burner Cell-1*"). Records from TracFone identified that this telephone was

purchased from Walmart. Neither TracFone nor T-Mobile maintained any subscriber

information for the account. Records from T-Mobile identified that other than text messages

exchanged with ROBERT CALDWELL's cellular telephone (as detailed below), no other calls

or text messages were made with the device.

19.    As part of the investigation, I have reviewed a report from the Greene County

(Ohio) Sheriff's Office regarding an alleged incident occurring between ROBERT CALDWELL

and STERLING ROBERTS in Jamestown, Ohio on or around August 5, 2017. Review of this

report provided the following information:

a.    ROBERT CALDWELL reported that on or around August 1, 2017, he began
receiving text messages from *Burner Cell-1*. In these messages, the person
claimed to be "Debbie Brown" and asked to hire ROBERT CALDWELL to
perform stonework at her house in Jamestown, Ohio. After an exchange of
messages, ROBERT CALDWELL agreed to meet "Debbie Brown" at a residence
in Jamestown on or around August 5, 2017.

b.    After ROBERT CALDWELL drove to the designated location, he found that it
appeared to be an abandoned residence. ROBERT CALDWELL then received
additional text messages instructing him to go to a different location in
Jamestown, Ohio. ROBERT CALDWELL went to this new location, and
STERLING ROBERTS arrived shortly thereafter in a grey Mitsubishi Eclipse
with Ohio temporary tags. The registration information for the vehicle's
temporary tags matched the vehicle purchased by TAWNNEY CALDWELL a
few weeks prior. STERLING ROBERTS reached toward his waistband and said
"what's up Bobby, you ready to die" (or words to that effect). ROBERT
CALDWELL fled the scene, chased by STERLING ROBERTS. ROBERT
CALDWELL pulled over at one point, and STERLING ROBERTS got out of his
vehicle and approached ROBERT CALDWELL. ROBERT CALDWELL saw
the handle of what he believed to be a gun in STERLING ROBERTS' waistband,
and ROBERT CALDWELL again fled the scene.

8

c.    ROBERT CALDWELL called 911 during the chase.  He was eventually able to escape from the chase and reported the matter to the Greene County Sheriff's Office.  On or around August 8, 2017, ROBERT CALDWELL was granted a Civil Stalking Protection Order against STERLING ROBERTS by the Greene County, Ohio Common Pleas Court, Domestic Relations Division.

20.    ROBERT CALDWELL's wife subsequently turned over to investigators a recording of a telephone call that was exchanged between ROBERT CALDWELL and STERLING ROBERTS on or around August 8, 2017.  This telephone call was recorded by ROBERT CALDWELL while his wife was present.  During the telephone call, STERLING ROBERTS acknowledged that he had lured ROBERT CALDWELL to the house in Jamestown, Ohio.  Below are excerpts of this conversation[2]:

| STERLING ROBERTS: | *(Unintelligible)* Don't be like that.  I got some important shit to talk to you though. |
| ROBERT CALDWELL: | Oh you do?  Like your trying to lure me out to that farm house, huh?  That, that was… |
| STERLING ROBERTS: | *(Unintelligible)* |
| ROBERT CALDWELL: | …that was, that was really clever of you |
| STERLING ROBERTS: | Oh, see?  And you want to automatically start arguing with me, bro.  Why the fuck do you think I've been calling you right now (*unintelligible*) call me if I was trying to lure you out to a farmhouse? |
| ROBERT CALDWELL: | Uh, that just happened Saturday morning, man.  What do you mean?  What's up? |
| STERLING ROBERTS: | It did. |
| ROBERT CALDWELL: | What are you trying… |
| STERLING ROBERTS: | It definitely did. |
| ROBERT CALDWELL: | It did.  So what's up? |

21.    During the course of interviews of friends and relatives of the identified subjects and review of various telephone records, law enforcement officers identified that TAWNNEY CALDWELL utilized telephone number 937-672-0901 (hereinafter referred to as "*TAWNNEY-Cell-1*") in August 2017, with service provided by AT&T.  Law enforcement officers also

---

[2] It should be noted that the quotations below, as well as in proceeding sections of the Affidavit, are preliminary transcripts.  Some of the words could be changed based on further review of the recordings.

identified that TAWNNEY CALDWELL and/or STERLING ROBERTS utilized telephone number 937-234-3818 (hereinafter referred to as "*TAWNNEY-Cell-2*") in August 2017, with service provided by Verizon. As part of the investigation, cell site, RTT, and/or NELOS[3] records were obtained for both cellular telephones and *Burner Cell-1* pursuant to court orders authorized by the United States District Court for the Southern District of Ohio. Review of the records revealed the following information regarding the use of the three phones on August 5, 2017 during the approximate time period of 10:45 a.m. to 12:15 p.m. (the time period related to the confrontation between STERLING ROBERTS and ROBERT CALDWELL in Jamestown, Ohio):

    a.    *Burner Cell-1* was in Greene County, Ohio.

    b.    *TAWNNEY-Cell-2* was in the area of TAWNNEY CALDWELL's residence and was used to make incoming and outgoing calls to another number (937-830-6801). Given that STERLING ROBERTS was in Greene County, it is reasonable to believe that TAWNNEY CALDWELL was using the phone during this time period.

    c.    No cell site or NELOS data was available for *TAWNNEY-Cell-1*. It is therefore reasonable to believe that she was not using her phone during this time period.

22.    As part of the investigation, another associate of STERLING ROBERTS who will be referred to for purposes of this Affidavit as "Male A" (whose true identity is known) was personally interviewed by law enforcement officers. Male A identified that he received telephone calls from STERLING ROBERTS on or around August 6, 2017 and August 8, 2017.

---

[3] When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course. These records are referred to as cell site records, and it is maintained by most cellular telephone providers (to include T-Mobile, AT&T, and Verizon). NELOS data is additional data maintained by AT&T. This data is like a historical "ping" wherein the approximate location of the phone is measured by the network then recorded in the records as a latitude, longitude and range of uncertainty. Range to Tower or RTT data is additional data maintained by Verizon. This data captures the time it takes for a signal to travel from the tower to the handset and back again. Based on this time, the network will provide a distance between the tower and cell phone. All three types of data for cellular telephones identifies the approximate location of the devices.

During these telephone calls, STERLING ROBERTS told Male A about the confrontation with

ROBERT CALDWELL in Jamestown, Ohio. According to Male A, STERLING ROBERTS

admitted that he intended to kill ROBERT CALDWELL during the confrontation. Below is a

summary of information provided by Male A about these telephone calls:

a.  STERLING ROBERTS said that he lured ROBERT CALDWELL to an abandoned farm house in Jamestown, Ohio. STERLING ROBERTS said that he went out ahead of time to find the house.

b.  STERLING ROBERTS said that he knew that ROBERT CALDWELL performed paver work. STERLING ROBERTS talked about how he sent text messages to ROBERT CALDWELL posing as a female customer. STERLING ROBERTS said that he provided a location to meet ROBERT CALDWELL, but because a family showed up at this location, STERLING ROBERTS had to provide a second location.

c.  STERLING ROBERTS said that he brandished a pistol when ROBERT CALDWELL showed up at the second meeting location. STERLING ROBERTS said that he wanted ROBERT CALDWELL dead. According to STERLING ROBERTS, ROBERT CALDWELL took off after seeing the pistol, and STERLING ROBERTS chased ROBERT CALDWELL. STERLING ROBERTS said that TAWNNEY CALDWELL was upset with him for not "finishing the job" (or words to that effect).

d.  During the telephone call on August 8, 2017, Male A communicated with STERLING ROBERTS on JEANINE ROBERTS' cellular telephone. STERLING ROBERTS said that he was at JEANINE ROBERTS' residence in Tennessee. STERLING ROBERTS expressed fears that TAWNNEY CALDWELL was trying to kill him.

23.  Also as part of the investigation, an adult female who will be referred to for

purposes of this Affidavit as "Female A" (whose true identity is known) was personally

interviewed by law enforcement officers. Female A identified that she spent time with

STERLING ROBERTS approximately one to two weeks before ROBERT CALDWELL was

murdered. Based on review of Female A's telephone, investigators determined that she spent

time with STERLING ROBERTS during the approximate time period of August 6 to 8, 2017

(beginning one day following the confrontation between STERLING ROBERTS and ROBERT

CALDWELL in Jamestown, Ohio). In summary, Female A provided the following information

during the interview:

  a.   During the time she spent with STERLING ROBERTS, he was using
       methamphetamine.

  b.   STERLING ROBERTS told Female A that he was going to kill ROBERT
       CALDWELL.

  c.   STERLING ROBERTS drove a Mitsubishi Eclipse (consistent with the vehicle
       purchased by TAWNNEY CALDWELL in July 2017). Female A observed
       STERLING ROBERTS with a handgun that she described as being black and
       silver in color on two to three occasions when they were in his vehicle.
       STERLING ROBERTS told Female A that he "stole" the gun from his brother.
       On one occasion, Female A observed STERLING ROBERTS point the gun at
       another man after this man called Female A an obscene name.

  d.   On one occasion when Female A was driving with STERLING ROBERTS in the
       Mitsubishi Eclipse, STERLING ROBERTS was concerned that he was being
       followed by someone. STERLING ROBERTS abandoned the Mitsubishi Eclipse
       in a church parking lot and thereafter abandoned the cellular telephone he was
       using at the time in a used tire store (both located in Dayton, Ohio).

  e.   After abandoning his vehicle and cellular telephone, STERLING ROBERTS'
       mother (JEANINE ROBERTS) picked him up and took him to Tennessee.
       TAWNNEY CALDWELL thereafter began contacting Female A via Facebook
       and/or cellular telephone and asking where STERLING ROBERTS' gun, vehicle,
       and cellular telephone were. TAWNNEY CALDWELL eventually met Female A
       at the house where STERLING ROBERTS' brothers lived (36 Virginia Avenue in
       Dayton, Ohio). STERLING ROBERTS' brother, the brother's girlfriend, and
       another unknown female were present during this meeting. During the meeting,
       Female A told TAWNNEY CALDWELL the location where STERLING
       ROBERTS abandoned his vehicle and cellular telephone.

  24.   An associate of STERLING ROBERTS who will be referred to for purposes of

this Affidavit as "Female B" (whose true identity is known) was interviewed as part of the

investigation by law enforcement officers. Consistent with the information provided by Female

A about STERLING ROBERTS going to Tennessee, Female B advised that she communicated

via telephone with STERLING ROBERTS on or around August 8, 2017. At his request, Female

B called STERLING ROBERTS on his mother's cellular telephone number. STERLING

ROBERTS told Female B that he was in Nashville, Tennessee. STERLING ROBERTS talked about how TAWNNEY CALDWELL blamed him for losing custody of her sons and told him that the only way to fix the situation was to "get rid of" ROBERT CALDWELL. STERLING ROBERTS commented that it was all part of "TAWNNEY's plan". STERLING ROBERTS also talked about the confrontation in Jamestown, Ohio, and said that he was "screwed up".

25. JEANINE ROBERTS was interviewed as part of the investigation. Consistent with the information provided by Female A and Female B, JEANINE ROBERTS advised that STERLING ROBERTS had stayed with her in Tennessee in August 2017, shortly before the homicide of ROBERT CALDWELL. JEANINE ROBERTS stated that she picked up STERLING ROBERTS at **CHANCE DEAKIN**'s and **CHRISTOPHER ROBERTS**' residence and drove STERLING ROBERTS to Tennessee. Based on information provided by Female A and Female B and cell site records for *TAWNNEY-Cell-1* and *TAWNNEY-Cell-2*, it was determined that STERLING ROBERTS stayed with JEANINE ROBERTS during the approximate time period of August 8 to 13, 2017. Below is a summary of other information provided by JEANINE ROBERTS during the interviews:

a. STERLING ROBERTS was addicted to methamphetamine. TAWNNEY CALDWELL introduced STERLING ROBERTS to his source of supply for narcotics.

b. JEANINE ROBERTS described TAWNNEY CALDWELL as being controlling of STERLING ROBERTS. JEANINE ROBERTS overheard conversations where TAWNNEY CALDWELL said (in what JEANINE ROBERTS thought was a joking manner) that she wanted STERLING ROBERTS to kill ROBERT CALDWELL so that they could be together. JEANINE ROBERTS also overheard conversations where TAWNNEY CALDWELL inquired about hiring a hitman to kill ROBERT CALDWELL. One of these conversations occurred in February 2017.

c. While they traveled from Ohio to Tennessee in August 2017, STERLING ROBERTS told JEANINE ROBERTS about the confrontation he had with ROBERT CALDWELL in Jamestown, Ohio. STERLING ROBERTS said that

he used the name "Debbie" (referring to Debbie Brown) because this was a name that TAWNNEY CALDWELL used when engaging in prostitution services. STERLING ROBERTS admitted that he lured ROBERT CALDWELL to the farm house. However, STERLING ROBERTS told JEANINE ROBERTS that he only intended to fight with ROBERT CALDWELL and did not plan to kill him. JEANINE ROBERTS overheard a telephone call that STERLING ROBERTS had with ROBERT CALDWELL about this confrontation (which is consistent with the recording provided by ROBERT CALDWELL's wife).

d.      During the time that STERLING ROBERTS stayed with JEANINE ROBERTS in August 2017, he talked about needing to get away from TAWNNEY CALDWELL and being afraid of her.

e.      TAWNNEY CALDWELL traveled to Tennessee to pick up STERLING ROBERTS and bring him back to Ohio. JEANINE ROBERTS sent a text message to TAWNNEY CALDWELL providing the address to JEANINE ROBERTS' residence. TAWNNEY CALDWELL drove her Dodge Durango to Tennessee. While in Tennessee, TAWNNEY CALDWELL talked about how her future did not include STERLING ROBERTS. TAWNNEY CALDWELL also talked about storing STERLING ROBERTS' vehicle in her garage.

f.      After ROBERT CALDWELL was murdered, JEANINE ROBERTS talked to STERLING ROBERTS on the telephone. STERLING ROBERTS denied that he killed ROBERT CALDWELL but said that he was "on the run" because law enforcement officers thought he had done so.

g.      JEANINE ROBERTS heard TAWNNEY CALDWELL talk about having fake birth certificates for her children and having ties to South America.

h.      JEANINE ROBERTS identified that her cellular telephone number was 937-668-4336.

26.      The investigation identified that just before and during the time period that STERLING ROBERTS was in Tennessee, additional activity transpired in the custody dispute regarding TAWNNEY CALDWELL's and ROBERT CALDWELL's sons. Below is a summary of this activity:

a.      On or around August 4, 2017, Minor Male B ran away from ROBERT CALDWELL's home and was subsequently located by law enforcement officers at CHANDRA HARMON's and JAMES HARMON's residence in Burlington, Kentucky. A social worker from the Department of Job and Family Services, Children's Services Division, thereafter transported Minor Male B to TAWNNEY CALDWELL's home. STERLING ROBERTS was at TAWNNEY

14

CALDWELL's residence at that time and identified himself as Minor Male B's uncle. The Children's Services worker telephonically contacted TAWNNEY CALDWELL (who was not home), and she falsely identified STERLING ROBERTS as her brother. Because the Children's Services worker was not aware of STERLING ROBERTS' true identity, she left Minor Male B at the house with STERLING ROBERTS. TAWNNEY CALDWELL thereafter would not return Minor Male B to ROBERT CALDWELL's custody.

b.     On or around August 8, 2017, ROBERT CALDWELL filed a motion requesting that TAWNNEY CALDWELL's parenting time be terminated. In the motion, it was noted that a warrant had been issued for STERLING ROBERTS' arrest for absconding from probation. This motion was personally served on TAWNNEY CALDWELL on or around August 9, 2017. It is therefore reasonable to believe that TAWNNEY CALDWELL was aware of the warrant for STERLING ROBERTS' arrest. In response to the motion, the Magistrate Judge terminated TAWNNEY CALDWELL's visitation rights with the children.

c.     On or around August 11, 2017, TAWNNEY CALDWELL filed an Ex-Parte Motion for Reallocation of Parental Rights and Responsibilities. In this motion, she alleged that ROBERT CALDWELL had sexually abused the three sons.

27.     The investigation determined that on or around August 11, 2017, TAWNNEY CALDWELL hired a Private Investigator to conduct surveillance on ROBERT CALDWELL. TAWNNEY CALDWELL provided photographs of ROBERT CALDWELL and his vehicle and information about his possible whereabouts to the Private Investigator for this surveillance activity. Records from the Private Investigator indicated that he conducted brief surveillance of ROBERT CALDWELL on or around August 12 and 13, 2017, and did not observe anything out of the ordinary.

28.     The contents of text messages exchanged on *TAWNNEY-Cell-2* and JEANINE ROBERTS' cellular telephone (telephone number 937-668-4336, as detailed above) were obtained from Verizon pursuant to a search warrant. Based on review of these records, it was determined that JEANINE ROBERTS sent a text message to *TAWNNEY-Cell-2* on or around August 12, 2017 at approximately 8:25 p.m., in which she provided her address. A response was received, presumably from TAWNNEY CALDWELL, stating "K, OTW" (an abbreviation for

"on the way"). Cell site, NELOS, and/or RTT records indicated that both *TAWNNEY-Cell-2* and *TAWNNEY-Cell-1* shortly thereafter traveled from the area of TAWNNEY CALDWELL's residence in Centerville, Ohio to Nashville, Tennessee, arriving during the late evening hours. Based on the information provided by JEANINE ROBERTS (as detailed above), this appears to be the trip that TAWNNEY CALDWELL took to pick up STERLING ROBERTS from JEANINE ROBERTS' residence.

29.     Cell site, NELOS, and/or RTT records indicated that both *TAWNNEY-Cell-2* and *TAWNNEY-Cell-1* departed from Nashville, Tennessee during the early evening hours of August 13, 2017. Both telephones then traveled to Murray, Kentucky. Based on records from Chase Bank, TAWNNEY CALDWELL's Visa debit card was used to rent a room at the Springhill Suites hotel in Murray, Kentucky on August 13, 2017. Cell site, NELOS, and/or RTT records indicated that both *TAWNNEY-Cell-1* and *TAWNNEY-Cell-2* traveled the following morning (August 14, 2017) to Burlington, Kentucky, arriving in the area of CHANDRA HARMON's and JAMES HARMON's residence.

30.     JAMES HARMON has been interviewed on multiple occasions as part of the investigation. JAMES HARMON identified that his telephone number was 859-653-4582. JAMES HARMON identified that TAWNNEY CALDWELL and STERLING ROBERTS arrived at his residence on August 14, 2017 and departed on the morning of August 15, 2017. They arrived and departed in a Dodge Durango that TAWNNEY CALDWELL was driving. JAMES HARMON provided the following information about the events that occurred during this time period:

       a.     JAMES HARMON had previously heard TAWNNEY CALDWELL and CHANDRA HARMON talk about wanting ROBERT CALDWELL dead. TAWNNEY CALDWELL and CHANDRA HARMON also said that TAWNNEY CALDWELL had asked her children if they would be okay if their

16

father (ROBERT CALDWELL) was dead. According to TAWNNEY CALDWELL and CHANDRA HARMON, the children said they would be okay if ROBERT CALDWELL died even if it meant that TAWNNEY CALDWELL would be in jail for a long time.

b. While at JAMES HARMON's residence, STERLING ROBERTS said that he tried to kill ROBERT CALDWELL approximately one week prior. STERLING ROBERTS said that he had set up a meeting for a potential job with ROBERT CALDWELL, and that STERLING ROBERTS was going to shoot ROBERT CALDWELL with a pistol. According to STERLING ROBERTS, ROBERT CALDWELL sped out of the area after figuring out what was transpiring. This description of events is consistent with the confrontation between STERLING ROBERTS and ROBERT CALDWELL on or around August 5, 2017 in Jamestown, Ohio (as detailed above).

c. On August 14, 2017, STERLING ROBERTS said that he knew where ROBERT CALDWELL was going to be located at some point in the future. Although STERLING ROBERTS was speaking in a cryptic manner, JAMES HARMON understood this to mean that STERLING ROBERTS planned to kill ROBERT CALDWELL.

d. Also on August 14, 2017, TAWNNEY CALDWELL asked JAMES HARMON to sell STERLING ROBERTS a rifle. TAWNNEY CALDWELL knew that JAMES HARMON needed money and suggested that he make the sale for the financial gain. Although JAMES HARMON knew that STERLING ROBERTS was a convicted felon, JAMES HARMON nevertheless sold STERLING ROBERTS an AK-47 rifle for approximately $120 to $140. TAWNNEY CALDWELL provided the cash that was used for the purchase. STERLING ROBERTS said that he would lie and say that he stole the gun from JAMES HARMON if he was ever caught with it in the future.

e. After the sale of the AK-47 rifle, JAMES HARMON asked TAWNNEY CALDWELL to help him purchase marijuana. TAWNNEY CALDWELL, STERLING ROBERTS, and JAMES HARMON thereafter drove together to **CHANCE DEAKIN**'s and **CHRISTOPHER ROBERTS**' residence (the **SUBJECT PREMISES**) in Dayton, Ohio. They departed during the late evening hours of August 14, 2017. JAMES HARMON drove his vehicle. TAWNNEY CALDWELL paid to fill up JAMES HARMON's vehicle with gasoline during the trip to or from Dayton.

f. When they arrived at the house in Dayton, **CHRISTOPHER ROBERTS**, **CHANCE DEAKIN**, and two females were at the house. STERLING ROBERTS asked **CHANCE DEAKIN** for "my 40" and said that he wanted it cleaned. **CHANCE DEAKIN** at first did not want to provide the gun, but STERLING ROBERTS demanded it. **CHANCE DEAKIN** returned to the room with what appeared to be a Smith and Wesson handgun that was silver and black

17

in color (which is consistent with the handgun described by Female A above). **CHANCE DEAKIN** and JAMES HARMON cleaned the handgun, and **CHANCE DEAKIN** gave it to STERLING ROBERTS. **CHRISTOPHER ROBERTS** was present when the gun was cleaned and provided to STERLING ROBERTS.

g.    Also while at the house in Dayton, TAWNNEY CALDWELL arranged to purchase marijuana from **CHRISTOPHER ROBERTS** for approximately $100. **CHRISTOPHER ROBERTS** provided both marijuana and Lysergic Acid Diethylamide (commonly known as LSD or acid) to JAMES HARMON. TAWNNEY CALDWELL also talked about providing **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS** with a handgun in the future.

h.    JAMES HARMON, STERLING ROBERTS, and TAWNNEY CALDWELL departed from the house in Dayton around 3:00 a.m. on August 15, 2017. STERLING ROBERTS had the Smith and Wesson handgun when they departed. They all traveled back to JAMES HARMON's residence in Kentucky.

i.    STERLING ROBERTS and TAWNNEY CALDWELL departed from JAMES HARMON's residence during the morning hours of August 15, 2017.

j.    JAMES HARMON maintained 40-caliber ammunition in his residence. Sometime after STERLING ROBERTS left, JAMES HARMON noticed that some of the rounds of ammunition were missing from one of his boxes. JAMES HARMON therefore assumed that STERLING ROBERTS had taken some of the ammunition from this box. A number of weeks later, JAMES HARMON also found a Smith and Wesson handgun that did not belong to him in his gun safe. He was concerned that this gun may have been put into his safe by STERLING ROBERTS the evening after the homicide. JAMES HARMON provided the Smith and Wesson handgun and the box containing the missing ammunition to law enforcement officers. Officers noted that the rounds of ammunition remaining in the box were stamped "Federal" and "40" and "S&W".

31.    Records from Chase Bank and Speedway LLC identified TAWNNEY CALDWELL's credit card was utilized to purchase fuel at a Speedway gas station in Florence, Kentucky at approximately 11:23 p.m. on August 14, 2017. These records are consistent with the information provided by JAMES HARMON that TAWNNEY CALDWELL paid for the gasoline for his vehicle during the trip to or from Dayton, Ohio (as detailed above).

32.    Records from Chase Bank also identified that on or around August 14, 2017, a withdrawal was made from TAWNNEY CALDWELL's Chase Bank debit card in the amount of

$340 in Burlington, Kentucky. Based on this information and the information provided by JAMES HARMON, it is reasonable to believe that this cash withdrawal may have been utilized to pay for the AK-47 rifle that STERLING ROBERTS purchased from JAMES HARMON and the marijuana that was purchased from **CHRISTOPHER ROBERTS**.

33. As part of the investigation, an adult female who will be referred to for purposes of this Affidavit as "Female C" (whose true identity is known) was personally interviewed by law enforcement officers. Female C identified that she was present at **CHANCE DEAKIN**'s and **CHRISTOPHER ROBERTS**' residence (the **SUBJECT PREMISES**) on the evening of August 14, 2017. Female C identified that **CHANCE DEAKIN**, **CHRISTOPHER ROBERTS**, and **CHANCE DEAKIN**'s girlfriend were initially at the residence, and that TAWNNEY CALDWELL, STERLING ROBERTS, and JAMES HARMON arrived thereafter. Below is a summary of information provided by Female C during the interview:

a. TAWNNEY CALDWELL, STERLING ROBERTS, and JAMES HARMON arrived at the **SUBJECT PREMISES** during the late evening hours. Female C went outside onto the porch when they arrived, and TAWNNEY CALDWELL and STERLING ROBERTS went inside with **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS**. Female C heard STERLING ROBERTS say "do you have my piece" (or words to that effect) when he arrived. It was Female C's impression that STERLING ROBERTS was asking for a gun.

   i. Based on my training and experience, I know that "piece" is a common term that individuals utilize to refer to a gun.

b. After a short period, STERLING ROBERTS, TAWNNEY CALDWELL, and **CHANCE DEAKIN** came out onto the front porch with Female C. Female C heard STERLING ROBERTS talk about a confrontation with ROBERT CALDWELL in Jamestown, Ohio. STERLING ROBERTS said that posing as a woman, he responded to an advertisement posted by ROBERT CALDWELL. STERLING ROBERTS boasted about how ROBERT CALDWELL was afraid and ran away when he saw STERLING ROBERTS. STERLING ROBERTS and TAWNNEY CALDWELL argued about what happened during the confrontation, and TAWNNEY CALDWELL said that it was STERLING ROBERTS' fault that her children were taken away from her. STERLING ROBERTS told TAWNNEY CALDWELL that he would take care of it.

19

   c.    Shortly after walking outside, STERLING ROBERTS retrieved a box and put something inside of it. Female C did not see what STERLING ROBERTS put inside the box but assumed that it was a gun.

   d.    While sitting on the porch, STERLING ROBERTS stated "I want that piece so I can smoke Bobby". He repeated this a few times with different but similar words. It appeared to Female C that he was rambling to himself.

   e.    STERLING ROBERTS appeared to be high from the effects of drugs. TAWNNEY CALDWELL stated that she had used Xanax and was also high.

   f.    Female C heard TAWNNEY CALDWELL and/or STERLING ROBERTS talk about purchasing marijuana for JAMES HARMON, but Female C never saw an exchange of marijuana.

   g.    STERLING ROBERTS, TAWNNEY CALDWELL, and JAMES HARMON departed approximately 30 minutes after coming onto the porch. STERLING ROBERTS took the box when he departed.

   34.    Cell site and NELOS records were also obtained for JAMES HARMON's cellular telephone pursuant to a court order authorized by the United States District Court for the Southern District of Ohio. Consistent with the information provided by JAMES HARMON, the cell site, NELOS, and/or RTT records for *TAWNNEY-Cell-1*, *TAWNNEY-Cell-2.* and JAMES HARMON's cellular telephone reflected that the three phones departed from Burlington, Kentucky during the late evening hours of August 14, 2017, and traveled to Dayton, Ohio. The phones arrived in the area of the **SUBJECT PREMISES** shortly around approximately 12:30 to 1:00 a.m. on August 15, 2017. The records reflected that less than two hours later, the phones then left Dayton, Ohio and traveled back to Burlington, Kentucky.

   35.    On or around September 22, 2017, both **CHRISTOPHER ROBERTS** and **CHANCE DEAKIN** were contacted at the **SUBJECT PREMISES** by investigators and asked about the above-noted trip that was made to their residence. **CHRISTOPHER ROBERTS** confirmed that STERLING ROBERTS and TAWNNEY CALDWELL came to the residence,

but he failed to reveal that JAMES HARMON was present. **CHRISTOPHER ROBERTS** stated that the visit was just a friendly visit, and that nothing transpired that would have been related to the investigation of ROBERT CALDWELL's homicide. **CHANCE DEAKIN** stated that he was not home during the visit. Based on all of the information noted in the Affidavit, it is reasonable to believe that **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS** lied to officers to conceal their involvement in the transfer of the firearm and/or the purpose of STERLING ROBERTS' visit to their home.

36.     Cell site, NELOS, and/or RTT records indicated that the *TAWNNEY-Cell-2* and *TAWNNEY-Cell-1* departed from Burlington, Kentucky during the late morning hours of August 15, 2017 (less than eight hours after returning from Dayton, Ohio), and traveled to Lebanon, Ohio. Records from both a Walmart store in Lebanon, TracFone, and Chase Bank identified that TAWNNEY CALDWELL's Visa debit card was utilized to purchase a TracFone cellular telephone at the Walmart store in Lebanon around 12:26 p.m. Surveillance footage was obtained for this transaction, and the footage appears to depict TAWNNEY CALDWELL making the purchase. Another individual is depicted in the surveillance footage who was near TAWNNEY CALDWELL, although he was only captured from the waist down. The appearance of this individual is consistent with STERLING ROBERTS.

37.     Records were obtained from TracFone and T-Mobile for the telephone purchased at the Walmart store in Lebanon, Ohio. Records from TracFone and T-Mobile identified that the telephone number for the device was 270-363-8919 (hereinafter referred to as *Burner Cell-2*). No subscriber information was maintained by TracFone and T-Mobile for this number. Records indicate that *Burner Cell-2* was activated at approximately 3:34 p.m. on August 15, 2017. The first four telephone calls made on *Burner Cell-2* were outgoing calls to *TAWNNEY-Cell-2*.

These calls appear to have been made as part of activating the phone. Cell site, NELOS, and/or RTT records for both *TAWNNEY-Cell-2* and *TAWNNEY-Cell-1* indicate that both cellular telephones were in the area of TAWNNEY CALDWELL's residence at the time the phone was activated.

38.     As part of the custody dispute involving ROBERT CALDWELL's and TAWNNEY CALDWELL's children, the Magistrate Judge ordered that ROBERT CALDWELL and his three children attend counseling services one time per week at an office in the Cornerstone Building located at 4134 Linden Avenue in Riverside, Ohio. Confirmations of the dates and times for these appointments were provided via text messages, emails, or telephone calls to both ROBERT CALDWELL and TAWNNEY CALDWELL. As such, TAWNNEY CALDWELL was aware of the dates and times of the appointments. As detailed above, STERLING ROBERTS told JAMES HARMON that he (STERLING ROBERTS) knew where ROBERT CALDWELL was going to be at some point in the future when he talked about killing ROBERT CALDWELL.

39.     ROBERT CALDWELL and the three sons had a counseling appointment at the Cornerstone Building on August 15, 2017. Surveillance footage that captured the Cornerstone Building identified that ROBERT CALDWELL and two of the sons arrived for the appointment at approximately 4:02 p.m., and the third son arrived approximately ten to fifteen minutes later.

40.     Cell site records were obtained from T-Mobile for *Burner Cell-2* pursuant to a court order authorized by the United States District Court for the Southern District of Ohio. Cell site, NELOS, and/or RTT records identified that around 4:00 p.m. on August 15, 2017, *TAWNNEY-Cell-1*, *TAWNNEY-Cell-2*, and *Burner Cell-2* departed from the area of TAWNNEY CALDWELL's residence in Centerville, Ohio. Cell site records indicated that *Burner Cell-2*

22

then traveled in a different direction than the other two phones and thereafter arrived in the area of the Cornerstone Building. At approximately 4:57 p.m., a telephone call was made from *Burner Cell-2* to *TAWNNEY-Cell-2*. Over the next approximately one hour (up until approximately 6:04 p.m.), a total of approximately seven telephone calls were exchanged between *Burner Cell-2* and *TAWNNEY-Cell-2*, for a total duration of approximately five minutes and fifteen seconds of call time. No calls were made to any other telephone numbers during this time. During the entire time, cell site records indicated that *Burner Cell-2* remained in the area of the Cornerstone Building and *TAWNNEY-Cell-2* and *TAWNNEY-Cell-1* remained in Centerville, Ohio, not far from TAWNNEY CALDWELL's residence.

41.     Consistent with the cell site records, surveillance footage that captured the Cornerstone Building revealed that a white male walked up to the building at approximately 4:02 p.m. on August 15, 2017. Officers and other witnesses (including family members and friends of STERLING ROBERTS) who have reviewed this footage and/or seen still images from the footages have concluded that the individual captured in the footage is STERLING ROBERTS. The surveillance footage captured STERLING ROBERTS walk up to the front of the building on two occasions and walk around ROBERT CALDWELL's vehicle. At approximately 5:25 p.m., the surveillance footage captured STERLING ROBERTS crouching down next to a mailbox near the front entrance, where he remained until approximately 5:57 p.m.

42.     Three women who arrived at the Cornerstone Building shortly before 5:57 p.m. were later interviewed by officers. All three women reported seeing a male squatting down by the mailbox, and two of the women reported seeing the man talk on a cellular telephone. One of the women reported that she heard the man say something to the effect of "I've already been waiting 15 minutes" while using his cellular telephone.

43. The surveillance footage captured ROBERT CALDWELL and his three sons exiting the Cornerstone Building at approximately 5:57 p.m. Immediately thereafter, the surveillance footage captured the man believed to be STERLING ROBERTS quickly get up from his squatting position and run toward ROBERT CALDWELL with his arm outstretched, appearing to fire shots from a handgun. ROBERT CALDWELL fell to the ground, and his sons fled the scene. STERLING ROBERTS stood between ROBERT CALDWELL's legs and appeared to continue shooting ROBERT CALDWELL in the head. STERLING ROBERTS then fled the scene.

44. Officers and paramedics were dispatched to the Cornerstone Building at approximately 6:00 p.m. Officers observed multiple gunshot wounds on ROBERT CALDWELL's head, upper torso, and arms. He was pronounced deceased at approximately 6:11 p.m. Among other items, officers collected approximately fourteen shell casings that were a mixture of brass and silver color. The silver casings were stamped with "Federal", "40", and S&W". These stamps are consistent with the ammunition that JAMES HARMON found missing from his residence and which he turned over to officers (as detailed above). The brass casings were stamped with "R-P", "40", and "S&W".

45. Telephone records for *Burner Cell-2* identified that an outgoing call was made from *Burner Cell-2* to *TAWNNEY-Cell-2* at approximately 6:00 p.m. (while still in the area of the Cornerstone Building). Cell site records indicated that *Burner Cell-2* then began heading in a southbound direction while continuing to communicate with *TAWNNEY-Cell-2*. In addition, *Burner Cell-2* made approximately nine outgoing calls to telephone number 937-242-5468. At least three of these calls appeared to be answered, for a total of over eight minutes of call duration. The investigation has determined that telephone number 937-242-5468 was used by

24

**CHANCE DEAKIN**.  As such, it appears that STERLING ROBERTS communicated with both TAWNNEY CALDWELL and **CHANCE DEAKIN** immediately after the homicide.

46.    Cell site, NELOS, and/or RTT records for *TAWNNEY-Cell-2* and *TAWNNEY-Cell-1* indicated that both telephones departed from the area of TAWNNEY CALDWELL's residence at approximately 6:00 p.m. on August 15, 2017, and arrived near the area of the Austin Landing shopping complex in Miamisburg, Ohio at approximately 6:09 p.m.  *Burner Cell-2* arrived in the area of the Austin Landing shopping complex at approximately 6:31 p.m.  This phone then traveled in a southbound direction.  Based on this information, it appears that TAWNNEY CALDWELL met with or attempted to meet with STERLING ROBERTS after the homicide.

47.    *TAWNNEY-Cell-2* was not used again after 6:09 p.m. on August 15, 2017.  No activity or cell site data appeared on *TAWNNEY-Cell-1* from approximately 6:06 p.m. to 9:03 p.m. on August 15, 2017, at which time cell site and RTT data indicated that the phone was back in the area of TAWNNEY CALDWELL's residence in Centerville, Ohio.  The last cell site data captured for *Burner Cell-2* was at approximately 7:03 p.m. on August 15, 2017, at which time the phone was just north of the downtown area of Cincinnati, Ohio.

48.    It was noted that at approximately 4:46 p.m. (the time at which STERLING ROBERTS was waiting at the Cornerstone Building and communicating with TAWNNEY CALDWELL on *TAWNNEY-Cell-2*), an outgoing call was made from *TAWNNEY-Cell-1* to a cellular telephone known to be used by CHANDRA HARMON.  Cell site and NELOS records obtained from AT&T for CHANDRA HARMON's phone indicated that she then began traveling from the area of her residence in Burlington, Kentucky to Ohio.  Cell site and NELOS records indicated that CHANDRA HARMON arrived in Beavercreek, Ohio shortly after approximately

6:00 p.m. CHANDRA HARMON's phone remained in the area of Beavercreek, Ohio until approximately 7:15 p.m., at which time it headed toward TAWNNEY CALDWELL's residence. Interviews of two witnesses determined that CHANDRA HARMON conducted the following activities during this time period:

a. Minor Male C played on a football team that had a practice on the evening of August 15, 2017 from approximately 6:00 p.m. to 8:00 p.m. Although Minor Male C never arrived at this practice, CHANDRA HARMON watched and video recorded it for a period of approximately one hour. After she received a telephone call, CHANDRA HARMON quickly got up and announced that she needed to leave.

b. Either later on the evening of August 15, 2017 or during the evening of August 16, 2017, CHANDRA HARMON took a dog that belonged to Minor Male A to a bar in or around Centerville, Ohio. CHANDRA HARMON said that she needed someone to care for the dog and left it with a friend of Minor Male A.

49. At the request of officers of the Riverside Police Department, deputies from the Montgomery County (Ohio) Sheriff's Office arrived at TAWNNEY CALDWELL's residence at approximately 8:20 p.m. on August 15, 2017 to search for STERLING ROBERTS. As deputies approached the house, they observed TAWNNEY CALDWELL and CHANDRA HARMON near TAWNNEY CALDWELL's vehicle. Deputies observed that the vehicle contained a lot of belongings, and it appeared to the deputies that TAWNNEY CALDWELL and CHANDRA HARMON were attempting to leave. TAWNNEY CALDWELL claimed to have seen STERLING ROBERTS "earlier in the day" but would not provide additional information. She was thereafter transported to the Riverside Police Department by deputies.

50. Upon arrival at the Riverside Police Departments, officers asked for TAWNNEY CALDWELL's cellular telephone. She refused to turn over the telephone and attempted to do something to it before officers removed it from her possession. She thereafter agreed to be interviewed after being advised of her Miranda rights. Below is a summary of information provided by TAWNNEY CALDWELL during the interview:

26

a.   TAWNNEY CALDWELL claimed that she had not seen or talked to STERLING ROBERTS since earlier in the morning.  She claimed to not know his current whereabouts.

b.   TAWNNEY CALDWELL discussed at length her relationship with ROBERT CALDWELL, various alleged abuse committed by him, and their custody dispute.

c.   When asked about the confrontation between STERLING ROBERTS and ROBERT CALDWELL in Jamestown, Ohio, TAWNNEY CALDWELL advised that she did not believe the incident occurred.

d.   Officers told TAWNNEY CALDWELL that ROBERT CALDWELL had been shot. TAWNNEY CALDWELL responded that she did not think that STERLING ROBERTS was capable of shooting or hurting anyone.

e.   In an attempt to determine STERLING ROBERTS' whereabouts, officers asked TAWNNEY CALDWELL about the names of STERLING ROBERTS' brothers and the address of his mother.  TAWNNEY CALDWELL claimed that she did not know the brothers' last names and did not know JEANINE ROBERTS' address.  TAWNNEY CALDWELL reported that STERLING ROBERTS had gone to JEANINE ROBERTS' residence in Tennessee the previous week, but TAWNNEY CALDWELL failed to disclose that she was also there.

  i.   As detailed above, TAWNNEY CALDWELL had picked up STERLING ROBERTS from JEANINE ROBERTS' residence three days prior after JEANINE ROBERTS texted her address to TAWNNEY CALDWELL. Also as detailed above, TAWNNEY CALDWELL had been served with a motion that included information about the arrest warrant that had been issued for STERLING ROBERTS.  It is therefore reasonable to believe that TAWNNEY CALDWELL was being untruthful with officers about her knowledge of STERLING ROBERTS' relatives in an attempt to conceal his possible whereabouts and prevent his arrest.

f.   TAWNNEY CALDWELL claimed that she did not know what car STERLING ROBERTS was currently driving.  When asked if he was driving a Mitsubishi Eclipse and who owned the vehicle, TAWNNEY CALDWELL responded that she did not want to answer the question.  She thereafter terminated the interview.

g.   The interviewing officers noted that TAWNNEY CALDWELL never inquired about ROBERT CALDWELL's condition during the interview.   Before TAWNNEY CALDWELL departed, they informed her that ROBERT CALDWELL was deceased.  She inquired if her sons had witnessed the shooting, and she was informed that they did.  The interviewing officers noted that TAWNNEY CALDWELL did not appear to be surprised or distressed about this information.

27

51. A search warrant was authorized by the United States District Court for the Southern District of Ohio for the cellular telephone seized from TAWNNEY CALDWELL on August 15, 2017. The search of the device determined that it was *TAWNNEY-Cell-1*. It was noted that the call log and text messages for the device had been deleted for the approximate time period of August 6, 2017 to the evening hours of August 15, 2017. Given that records from AT&T identified that calls and text messages had been made during this time period, it appears that TAWNNEY CALDWELL deleted this data in an attempt to conceal her communications with STERLING ROBERTS and/or other data pertinent to law enforcement officers' investigation.

52. During interviews of JAMES HARMON, he identified that STERLING ROBERTS traveled to Burlington, Kentucky during the evening after the homicide. Below is a summary of information provided by JAMES HARMON regarding the visit:

    a. On the evening of August 15, 2017, JAMES HARMON received a telephone call from TAWNNEY CALDWELL. She told him that she was in the back seat of a police cruiser but did not tell him why.

    b. Later on in the evening of August 15, 2017, STERLING ROBERTS called JAMES HARMON. STERLING ROBERTS asked if he could fix his vehicle at JAMES HARMON's residence, and JAMES HARMON agreed. STERLING ROBERTS arrived in a Mitsubishi Eclipse vehicle (consistent with the vehicle purchased by TAWNNEY CALDWELL in July 2017).

    c. Although they did not specifically discuss it, JAMES HARMON presumed that STERLING ROBERTS had killed ROBERT CALDWELL based on the telephone call from TAWNNEY CALDWELL, previous discussions, and STERLING ROBERTS' behavior. STERLING ROBERTS asked to replace a fuse on his vehicle and take a shower. JAMES HARMON agreed and went to a different part of his residence while STERLING ROBERTS conducted these activities.

    d. Before leaving, STERLING ROBERTS asked JAMES HARMON for a cellular telephone. JAMES HARMON provided a pre-paid cellular telephone that he had in his possession to STERLING ROBERTS. When STERLING ROBERTS was leaving, JAMES HARMON told STERLING ROBERTS "way to step up" (or

words to that effect) as a congratulatory comment about the homicide.

e.    After STERLING ROBERTS departed, JAMES HARMON noticed that STERLING ROBERTS had left his clothing outside of the shower. JAMES HARMON burned the clothing at his residence in Kentucky. JAMES HARMON later saw surveillance photographs that had been released by the media that depicted STERLING ROBERTS at the homicide scene, and JAMES HARMON believed that the clothing STERLING ROBERTS left outside of the shower was the clothing he had worn during the homicide.

53.    An associate of TAWNNEY CALDWELL (whose true identity is known) informed law enforcement officers that TAWNNEY CALDWELL had utilized telephone number 937-503-4670 (hereinafter referred to as *"Burner Cell-3"*). Records from TracFone and Verizon identified that *Burner Cell-3* was purchased from a Walmart store in Sugarcreek Township, Ohio on or around August 15, 2017, paid for in cash. The phone was activated during the early morning hours of August 16, 2017. No subscriber information was maintained for this phone. Call records for the phone began with a "blocked"[4] outgoing call from *Burner Cell-3* to JEANINE ROBERTS' cellular telephone. Call records also identified that five outgoing blocked calls were made from *Burner Cell-3* to *Burner Cell-2* between approximately 1:34 a.m. and 1:43 a.m. None of the calls were answered but rather were sent to voicemail. Based on all of the information noted in the Affidavit, it is reasonable to believe that TAWNNEY CALDWELL was attempting to communicate with STERLING ROBERTS after the homicide.

54.    On or around August 19, 2017, STERLING ROBERTS was arrested in Spartanburg, South Carolina after he confronted and fired shots at a deputy outside of a gas station. STERLING ROBERTS utilized an AK-47 rifle during this shooting. After additional deputies arrived, STERLING ROBERTS surrendered and was taken into custody. The AK-47

---

[4] Individuals can make "blocked" calls by dialing *67 prior to the outgoing telephone number. Doing so blocks the caller's phone number from the receiving party.

rifle was recovered, and a trace report from the Bureau of Alcohol, Tobacco, and Firearms (ATF) identified that it was purchased by JAMES HARMON. Therefore, it is reasonable to believe that STERLING ROBERTS utilized the rifle he purchased from JAMES HARMON on August 14, 2017, after transporting it from Kentucky to Ohio and ultimately to South Carolina. It was noted that at the time of his arrest, STERLING ROBERTS was wearing shoes that appeared very similar to the shoes worn during the homicide of ROBERT CALDWELL, as captured in the surveillance footage.

55. The 2003 Mitsubishi Eclipse that was purchased by and registered to TAWNNEY CALDWELL was found at the scene of the shooting in Spartanburg, South Carolina. Subsequent searches of this vehicle and STERLING ROBERTS' person did not locate any additional firearms or cellular telephones. As such, it appears that he had disposed of the cellular telephone he used during the homicide, the cellular telephone provided to him by JAMES HARMON, and the handgun that was used to murder ROBERT CALDWELL. A search of the vehicle located a pair of sunglasses that appeared to be very similar to the sunglasses worn by STERLING ROBERTS during the homicide of ROBERT CALDWELL, as captured in the surveillance footage.

56. During his arrest, STERLING ROBERTS told deputies that he was a suspect in a homicide in Ohio. STERLING ROBERTS claimed that he was being "framed". STERLING ROBERTS was interviewed by deputies of the Spartanburg County (South Carolina) Sheriff's Department later on August 19, 2017, after being advised of his Miranda Rights. The interview was video and audio recorded. Below is a summary of information provided by STERLING ROBERTS during this interview:

   a.    When shown a still image of the suspect from the shooting of ROBERT CALDWELL at the Cornerstone Building, STERLING ROBERTS admitted that

he was the individual depicted in the image. However, STERLING ROBERTS denied that he shot ROBERT CALDWELL. STERLING ROBERTS admitted that he had been at the Cornerstone Building. STERLING ROBERTS claimed that because the door was locked, he went to a neighboring business and then to a friend's house.

b.  STERLING ROBERTS stated that he had thrown his cellular telephone out the car window sometime during the trip to South Carolina.

c.  When providing STERLING ROBERTS with a cigarette break (which was not recorded), STERLING ROBERTS told the deputy that he was glad that ROBERT CALDWELL was dead. STERLING ROBERTS noted that he would not say this while he was being recorded.

57.  STERLING ROBERTS was interviewed again by detectives of the Riverside Police Department on or around August 29, 2017, after being advised of his Miranda rights. The interview was video and audio recorded. Below is a summary of information provided by STERLING ROBERTS during the interview:

a.  STERLING ROBERTS admitted that he had met with ROBERT CALDWELL in Jamestown, Ohio earlier in the month. However, STERLING ROBERTS denied that he tried to kill ROBERT CALDWELL when they met.

b.  STERLING ROBERTS advised that he fled Ohio because he knew there were outstanding warrants for his arrest. STERLING ROBERTS advised that he had intended to drive to Jacksonville, Florida. He had seen the news about ROBERT CALDWELL's murder and the fact that he was a suspect while he was in Nashville, Tennessee.

i.  Prior to his arrest in Spartanburg, South Carolina, a warrant had been issued for STERLING ROBERTS' arrest by the Montgomery County, Ohio Court of Common Pleas for Absconding. The warrant was the result of him failing to abide by the conditions of his Community Control for the Having Weapons While Under Disability conviction. The warrant was issued on August 3, 2017. The warrant was amended on August 17, 2017 to be nationwide.

c.  When shown a still image from the surveillance footage of the suspect from the shooting of ROBERT CALDWELL, STERLING ROBERTS admitted that he was the individual captured in the image. STERLING ROBERTS claimed that he was at the building to look into the possibility of seeking treatment for his drug addiction. STERLING ROBERTS denied that he shot ROBERT CALDWELL.

d.   STERLING ROBERTS knew that ROBERT CALDWELL and his sons received counseling at the Cornerstone Building, as he had driven the sons there on past occasions. STERLING ROBERTS denied knowing that ROBERT CALDWELL and the sons had an appointment the day of the shooting.

e.   STERLING ROBERTS said that he was upset about the custody dispute between TAWNNEY CALDWELL and ROBERT CALDWELL and the impact it had on TAWNNEY CALDWELL.

58.   On or around October 3, 2017, officers of the Riverside Police Department and agents of the FBI executed a search warrant at TAWNNEY CALDWELL's residence in Centerville, Ohio.   Among other items, an Apple iPhone was seized from TAWNNEY CALDWELL's person.   A Chase Bank Visa debit card was also located in and seized from TAWNNEY CALDWELL's purse.   This was the same debit card that was used to purchase *Burner Cell-2* and the 2003 Mitsubishi Eclipse.   During the subsequent search of TAWNNEY CALDWELL's iPhone, law enforcement officers noted that TAWNNEY CALDWELL had saved as contacts in her cellular telephone the telephone numbers for **CHANCE DEAKIN** (saved under the name "Chance Riberts"), **CHRISTOPHER ROBERTS** (saved under the name "CHRISTOPHER ROBERTS"), CHANDRA HARMON (saved under the name "Mom"), and JAMES HARMON (saved under the name ("Jim Harmon").   As detailed above, TAWNNEY claimed that she did not know **CHANCE DEAKIN**'s or **CHRISTOPHER ROBERTS**' last names when she was interviewed by law enforcement officers on August 15, 2017 (as detailed above).

59.   At the request of officers, JAMES HARMON agreed to meet and record a conversation with TAWNNEY CALDWELL on or around November 17, 2017 in Centerville, Ohio. Below is a summary of this recording:

a.  JAMES HARMON told TAWNNEY CALDWELL that he had received a letter from the ATF[5] about the AK-47 rifle he sold to STERLING ROBERTS (which STERLING ROBERTS used during the shooting in Spartanburg, South Carolina). JAMES HARMON noted that he should have never sold it to STERLING ROBERTS, but that TAWNNEY CALDWELL had asked him to do so. TAWNNEY CALDWELL did not say anything in response to JAMES HARMON's statements.

b.  JAMES HARMON also told TAWNNEY CALDWELL that he found a Smith and Wesson handgun in his gun safe, and he was concerned that STERLING ROBERTS had put it there and that it was the gun he used in the homicide. TAWNNEY CALDWELL first responded that it was not STERLING ROBERTS' gun but rather her gun. TAWNNEY CALDWELL advised that her lawyer had told her to remove any weapons from her home because police officers would be searching it, so she had her mother or brother bring it to JAMES HARMON's house. After further discussion, TAWNNEY CALDWELL became concerned that the gun in the safe may in fact have been used by STERLING ROBERTS.

c.  TAWNNEY CALDWELL provided JAMES HARMON with various instructions on what to tell law enforcement officers about the rifle and handgun if he was ever questioned by law enforcement officers. Below are excerpts from the recording:

| JAMES HARMON: | What do you want to do? Do you want to talk to your mom? |
| TAWNNEY CALDWELL: | Yeah. Yeah. Don't call them back today. |
| | . . . . . . . . . |
| JAMES HARMON: | He pulled into my back garage, asked could I work on my car, I said yes. He took a shower, I was down in my office and I gave him run of the house and I suspect that gun in my safe is the, the weapon. He's not a bright man. |
| TAWNNEY CALDWELL: | Jesus Christ. Don't call them and tell them this. They don't even know you were with us at Chance's. |
| JAMES HARMON: | I'm more concerned about if, if, if I get a search warrant so I, I, I put it in a safe place. I took it out of the safe. |
| TAWNNEY CALDWELL: | Okay. |
| JAMES HARMON: | Have you talked to Sterling? Can you talk to Sterling? |

---

[5]This letter was not actually sent by the ATF but rather was created by law enforcement officers for use during the recording.

| | |
|---|---|
| TAWNNEY CALDWELL: | No, absolutely not. Uh, Jesus Christ, Jesus Christ. You need to tell them he stole it from you and stick to your story. And that you never, you thought that he had an AK-47, you didn't even know it was gone. You don't even know what gun they're talking about. |
| | . . . . . . . . . |
| JAMES HARMON: | What do you think your mom's going to do? |
| TAWNNEY CALDWELL: | Well if you, if you say this whole story of the night before and everything else, then we're all going to go to jail. For a long time. Seriously, I wouldn't say that. |
| | . . . . . . . . . |
| TAWNNEY CALDWELL: | Whatever. Okay, what would you like to do? |
| JAMES HARMON: | I want to tell the truth. |
| TAWNNEY CALDWELL: | Okay, well then I'm going to jail for life. |
| | . . . . . . . . . |
| TAWNNEY CALDWELL: | Say you thought the guns were at my brother's. And then you just got this letter. And that's all you know. The end. We were there the night before, we left, the end. If not, you're going to be implicated on a murder too. I mean, look at it, um, big time. |
| | . . . . . . . . . |
| TAWNNEY CALDWELL: | Okay, I need to know what you're going to say before you say it. Okay? Cause I, I have to know that. Cause once, if they arrest me and take me somewhere, I need to know what you said. Cause right now, everybody's left you completely out of it. |
| | . . . . . . . . . |
| TAWNNEY CALDWELL: | How about you just, you didn't know? Why can't it be that simple? |
| JAMES HARMON: | I don't think they'll buy it. |
| TAWNNEY CALDWELL: | Continue to say it. Who's going to say otherwise? You have one person to say otherwise, that's me. I'm sure they'll threaten you with a million things. So what? |

60.     Also on or around November 17, 2017, JAMES HARMON agreed to meet and record a conversation with CHANDRA HARMON in Centerville, Ohio. TAWNNEY CALDWELL later joined the conversation. Below is a summary of the recording:

    a.     CHANDRA HARMON said that TAWNNEY CALDWELL had told her (CHANDRA HARMON) about the letter JAMES HARMON received from the

ATF. CHANDRA HARMON instructed JAMES HARMON on a number of occasions to tell law enforcement officers that he did not know that the gun was missing from his house.

b.    Both CHANDRA HARMON and TAWNNEY CALDWELL told JAMES HARMON that law enforcement officers will lie to him and try to scare him if they ever questioned him. Both CHANDRA HARMON and TAWNNEY CALDWELL told JAMES HARMON to maintain his "story" about not knowing that the gun was missing. CHANDRA HARMON and TAWNNEY CALDWELL also provided JAMES HARMON with various instructions on what to say if he was ever questioned by law enforcement officers. They repeatedly told him to "stay out of it" and told him that he would go to prison if he did not do so. Below are a few excerpts of these instructions:

| | |
|---|---|
| CHANDRA HARMON: | Yeah, and, and, if they show up at the house, they'll try and scare you to death. You would not believe the things that they say to you, and… |
| TAWNNEY CALDWELL: | And they make up all kinds of lies and do things. |
| CHANDRA HARMON: | Big lies, and they try to *(unintelligible)*. |
| | . . . . . . . . . |
| TAWNNEY CALDWELL: | Yeah, I would just say that *(unintelligible)* if you go in and say, oh I sold him the gun the night before, they're going to know you were there the night before, then you're going to be implicated in a murder, you'll go to jail too for murder as well *(unintelligible)* and after, you know what I mean? So they don't know any better, they have no idea. |
| CHANDRA HARMON: | And he said, what if Sterling says… |
| TAWNNEY CALDWELL: | Absolutely not. |
| CHANDRA HARMON: | …something and… |
| TAWNNEY CALDWELL: | Sterling, Sterling says, Sterling told me the night he bought the gun in South Carolina. You won't need to know any of that. He told me that he bought it at a flea market and that's what he told them, and Sterling would never change his story until the death of him *(unintelligible)*. |
| CHANDRA HARMON: | Truly? He would never? |
| TAWNNEY CALDWELL: | He won't say anything at all, would never ever. Nor did Chance, nor did Chris, nor did anyone else. *(Unintelligible)* when they said who came to your house the night before, he said Sterling and me. |
| | . . . . . . |
| CHANDRA HARMON: | If someone took one of your guns from our house, you didn't know about it. That's easy to say. Yes? I, I hope for you to stay the hell out of it. Can you do that? Honestly, can you? |

| JAMES HARMON: | Yeah, I, I. |
| CHANDRA HARMON: | Why would you want to do anything else? |
| JAMES HARMON: | I'm just scared to death. |
| TAWNNEY CALDWELL: | Well you should be more scared to death of telling the damn truth. |

. . . . . .

| TAWNNEY CALDWELL: | *(Unintelligible)* question you about that night, like in detail later on down the road, we came to your house, we stayed there, we left, went up to uh, well you don't know, we went up to Dayton or whatever, wherever we went to, wherever you don't know. And then when we got back, you were still awake 'cause you stayed awake all night doing things and we all went to, uh, White Castle. Ok? |

. . . . . .

| CHANDRA HARMON: | Don't let them scare you. |
| JAMES HARMON: | Alright. |
| CHANDRA HARMON: | You have to truly put on your big girl panties with these people because they will try and scare the fuck out of you. |

c.   Regarding the gun that JAMES HARMON found in his gun safe, TAWNNEY CALDWELL told JAMES HARMON the following: "But that other gun. You need to get that the hell out of your property."

d.   Prior to departing, TAWNNEY CALDWELL provided JAMES HARMON with four suspected Xanax pills to calm his nerves. JAMES HARMON turned these pills over to investigators at the conclusion of the recording.

61.   Based on the statements made above and other information noted in the Affidavit, it is reasonable to believe that both TAWNNEY CALDWELL and CHANDRA HARMON were attempting to intimidate, persuade, or prevent JAMES HARMON from providing material testimony to law enforcement officers about the weapons used by STERLING ROBERTS in the homicide of ROBERT CALDWELL and the shooting in South Carolina. It is also reasonable to believe that TAWNNEY CALDWELL instructed JAMES HARMON to get rid of the firearm found in his safe because TAWNNEY CALDWELL believed it was used by STERLING ROBERTS in the homicide of ROBERT CALDWELL. Furthermore, TAWNNEY CALDWELL's statements indicate that she knew what **CHRISTOPHER ROBERTS** and

36

**CHANCE DEAKIN** previously had told law enforcement officers about the visit to their residence on August 15, 2017. As such, it appears that they conspired with each other about what to tell officers in order to impede the investigation.

62. On or around November 29, 2017, at the direction of law enforcement, JAMES HARMON agreed to meet and record a conversation with **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS** at the **SUBJECT PREMISES**. JAMES HARMON went to the residence to deliver manure that **CHRISTOPHER ROBERTS** wanted for growing psychedelic mushrooms. Present when JAMES HARMON arrived were **CHANCE DEAKIN**, **CHRISTOPHER ROBERTS**, and two females. Another unknown male arrived during the recording to sell a quantity of psychedelic mushrooms to **CHRISTOPHER ROBERTS** and collect a prior drug debt. Below is a summary of the recording:

a. JAMES HARMON asked if **CHRISTOPHER ROBERTS** had talked to his brother (referring to STERLING ROBERTS). **CHRISTOPHER ROBERTS** responded that he had not done so because he did not want their conversations to be recorded (referring to recordings of calls made by inmates at jails).

b. **CHRISTOPHER ROBERTS** said that the last time that JAMES HARMON and TAWNNEY CALDWELL were at the house, TAWNNEY CALDWELL was supposed to give him something. **CHANCE DEAKIN** thereafter explained that TAWNNEY had an "old 40" (referring to a 40-caliber gun) that she was supposed to trade them.

c. JAMES HARMON talked about the night that he and **CHANCE DEAKIN** "cleaned that gun" (referring to the gun they cleaned for STERLING ROBERTS the day before ROBERT CALDWELL's homicide). JAMES HARMON said that he was concerned about their fingerprints being on the gun. **CHANCE DEAKIN** responded that they wiped the gun down well, and he didn't think their fingerprints would be on it.

d. JAMES HARMON talked about finding a gun in his gun safe and being worried about it being the gun used by STERLING ROBERTS. **CHANCE DEAKIN** suggested that JAMES HARMON get rid of this gun. **CHRISTOPHER ROBERTS** also talked about the gun that TAWNNEY CALDWELL was supposed to give him in exchange for the gun provided to STERLING ROBERTS in August 2017. Below is an excerpt of their conversation:

37

| | |
|---|---|
| JAMES HARMON: | A gun that looked exactly like the one you and I cleaned was in my safe. |
| **CHANCE DEAKIN**: | The Taurus? |
| JAMES HARMON: | I, I think it was. |
| **CHANCE DEAKIN**: | Yeah. |
| JAMES HARMON: | It was a silver and black one with a… |
| **CHANCE DEAKIN**: | I would get rid of that. |
| JAMES HARMON: | I did. |
| **CHANCE DEAKIN**: | Okay. |
| JAMES HARMON: | Is that the gun? |
| **CHANCE DEAKIN**: | I think so. |
| JAMES HARMON: | Okay. |
| **CHANCE DEAKIN**: | Taurus (*unintelligible*) Taurus, absolutely. |
| **CHRISTOPHER ROBERTS**: (*Unintelligible*) | |
| JAMES HARMON: | It's off, it's off the pro-. Here's the other thing, I'm doing, I'm not. Hi there *(speaking to unknown female)*. I got rid of everything I'm not, I might smoke a joint now and then but I'm not Keeping anything on my property. |
| **CHANCE DEAKIN**: | Right, for the time, I know. |
| JAMES HARMON: | Um and I think you guys should be careful as well. |
| **CHANCE DEAKIN**: | Right. |
| JAMES HARMON: | But um, so I got rid of that gun, but I didn't know if that was the one that Tawnney had legit for me or not. |
| **CHANCE DEAKIN**: | I don't think it was the legit one. The legit one will say SW 40 on it. It's a Smith and Wesson. It looks similar but it's different. The slide is more slender, it looks like a Glock, literally looks like a Glock but it's silver and black. |
| | . . . . . . . . . . |
| JAMES HARMON: | Well it's ghandi, I got rid of it. |
| **CHANCE DEAKIN**: | (*Unintelligible*), that's what I'm saying. |
| **CHRISTOPHER ROBERTS**: | That's what I'm saying too, like the trade, it wouldn't be wise to have a 40 at all. |
| **CHANCE DEAKIN**: | Right. |
| **CHRISTOPHER ROBERTS**: | For that, you know what I'm saying. Like, like The trade, she was going to give me a 40. And Then, you know, it just wouldn't be wise for either one of us, or any of us, to have, you know what I'm saying. Like, like, yeah, it's not gonna work. I didn't take a huge hit on it, but I was uh, well I haven't got a chance to talk to her either, just because I figured you know, silence is best. |

63.     Based on the statements made above and other information noted in the Affidavit, it is reasonable to believe that both **CHRISTOPHER ROBERTS** and **CHANCE DEAKIN** were participants in the transfer of the handgun to STERLING ROBERTS during the late evening hours of August 14, 2017 or early morning hours of August 15, 2017. It is also reasonable to believe that **CHANCE DEAKIN** instructed JAMES HARMON to get rid of the firearm found in JAMES HARMON's safe because **CHANCE DEAKIN** thought it was used by STERLING ROBERTS in the homicide of ROBERT CALDWELL.

64.     Following the homicide of ROBERT CALDWELL, his parents were awarded custody of the three children. TAWNNEY CALDWELL was forbidden from having any unsupervised contact with her three children, including by telephone.

65.     During the late evening hours of August 21, 2017, following the funeral of ROBERT CALDWELL, Minor Male B left his grandparents' residence without their permission or knowledge. His whereabouts have been unknown since that time. During an investigation conducted by the Sugarcreek Township Police Department, officers have attempted to interview and obtain information from TAWNNEY CALDWELL and other family members. Officers have noted that TAWNNEY CALDWELL and some of the family members have not been cooperative and refused to answer questions. Several individuals have told officers that Minor Male B has been staying with family members of TAWNNEY CALDWELL, and that the family members were attempting to conceal his whereabouts.

66.     Also during the course of the investigation of Minor Male B's disappearance, the following information was learned by the Sugarcreek Township Police Department:

a.     On or around August 29, 2017, Minor Male A's grandparents found Minor Male A in possession of a cellular telephone. Minor Male A told officers that TAWNNEY CALDWELL had given this telephone to a friend, who then

39

arranged for it to be given to Minor Male A. As noted above, the court had forbidden TAWNNEY CALDWELL from having any unsupervised contact with the children. Review of the device determined that it was a pre-paid Simple Mobile TracFone. The Uber application was on the phone, and TAWNNEY CALDWELL's credit card was connected to the application. In addition, TAWNNEY CALDWELL's cellular telephone number was saved in the phone under the letter "Q". The friend involved in providing the phone to Minor Male A was also contacted, and this friend confirmed that TAWNNEY CALDWELL had in fact given him the phone and asked him to provide to Minor Male A.

b.  Officers learned that on or around December 16, 2017, TAWNNEY CALDWELL and her aunt met with Minor Male A at a Panera restaurant in Sugarcreek Township, Ohio, again contrary to the court order. Surveillance footage from the restaurant was obtained by officers, and this footage captured the meeting. Minor Male A told officers that he had communicated with TAWNNEY CALDWELL via Instagram. Minor Male A identified that TAWNNEY CALDWELL's Instagram account was mich5253. Although Minor Male A was vague about how he communicated with TAWNNEY CALDWELL on Instagram, one of his friends who was with him on December 16, 2017 told officers that TAWNNEY CALDWELL sent Minor Male A photographs of where she was to signify where she wanted him to meet her. Minor Male A told investigators that when he met with TAWNNEY CALDWELL on December 16, 2017, she indicated that Minor Male B was likely in California.

67.  Minor Male A has been interviewed on several occasions pursuant to the investigation. In addition to the information noted above, Minor Male A provided the following information:

a.  Minor Male A denied that TAWNNEY CALDWELL ever talked to him about plans to murder ROBERT CALDWELL.

b.  A few weeks after ROBERT CALDWELL obtained custody of Minor Male A and his brothers, TAWNNEY CALDWELL talked to them about taking a cruise to Mexico and never returning.

c.  TAWNNEY CALDWELL had instructed him and his brothers to behave poorly when they were in the custody of their grandparents so that the grandparents would give up custody of them. TAWNNEY CALDWELL also instructed Minor Male A not to take his prescribed medication. TAWNNEY CALDWELL referred to this as "plan B". TAWNNEY CALDWELL had sent a text message to Minor Male A stating "bbbbb" (or something to that effect) to remind him to behave poorly.

68.    TAWNNEY CALDWELL was arrested by officers of the Sugarcreek Township Police Department on December 22, 2017 for Violating a Protection Order.  This charge related to her contact with Minor Male A on December 16, 2017 (as detailed above).  Seized from her person pursuant to her arrest was an Apple iPhone.  The arresting officer noted that prior to her arrest, TAWNNEY CALDWELL attempted to lock or otherwise access the phone.  She also was uncooperative with the officer when he seized it.  Officers later obtained a search warrant to examine this device.  The examination of the device revealed that email messages sent and received from the email account tawnney@aol.com were stored on the phone.  A preliminary review of the messages on the tawnney@aol.com email account revealed two email messages received from the Apple website providing notifications that the user had disabled her Find My iPhone feature.  One of the messages was received on August 8, 2017 at approximately 3:10 p.m., and the other message was received on August 15, 2017 at approximately 6:35 p.m.  The message on August 15, 2017 corresponds with the time period directly after the homicide of ROBERT CALDWELL.

## EVIDENCE TO BE SOUGHT IN SEARCH WARRANTS

69.    Records from the Montgomery County (Ohio) Auditor's website identified that the **SUBJECT PREMISES** is currently owned by JEANINE ROBERTS.    JEANINE ROBERTS, Female C, and JAMES HARMON have all told law enforcement officers that **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS** reside at the **SUBJECT PREMISES**. During the time period of September 2017 to December 2017, law enforcement officers have been to the **SUBJECT PREMISES** on three occasions.  On all of these occasions, officers have encountered **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS** at the residence.  Based on

41

this and other information noted in the Affidavit, I believe that **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS** reside at the **SUBJECT PREMISES**.

Firearms and Ammunition

70.     Based on the information detailed above, there is probable cause to believe that STERLING ROBERTS obtained a 40-caliber handgun from **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS** at the **SUBJECT PREMISES** during the late evening hours of August 14, 2017 or the early morning hours of August 15, 2017, and that this handgun was used during the homicide of ROBERT CALDWELL on August 15, 2017.  As detailed above, shell casings for two types of 40-caliber ammunition were recovered from the scene of the homicide – some that were silver and some that were brass.  Based on the information provided by JAMES HARMON, the silver ammunition may have been obtained from JAMES HARMON's residence. It is reasonable to believe that the brass ammunition STERLING ROBERTS utilized may hav been obtained from the **SUBJECT PREMISES**.  Given that ammunition is typically purchased in boxes, and that these boxes often contain more ammunition than what can be held in a single magazine, it is reasonable to believe that some of the same type of ammunition that STERLING ROBERTS used in the homicide of ROBERT CALDWELL may still be located at the **SUBJECT PREMISES**.

71.     Based on my training and experience, I know that individuals often tender and obtain various documents when they purchase firearms.  These documents may include the sales receipts, bills of sale, owners' manuals, and other similar documents.  Such documents are often maintained in the owners' residences.  I also know, based on my training and experience, that individuals often keep the boxes, holsters, extra magazines, and other accessories to the firearms they purchase.  Based on this information, it is reasonable to believe that documents and/or other

paraphernalia associated with the handgun STERLING ROBERTS obtained from the **SUBJECT PREMISES** may still be located at the **SUBJECT PREMISES**.

72. An adult male who will be referred to for purposes of this Affidavit as "Male B" (whose true identity is known) was interviewed pursuant to the investigation. Male B identified that he had seen **CHANCE DEAKIN** with firearms on past occasions. Male B also identified that firearms were stolen from his residence around early May 2017. Male B learned from others that STERLING ROBERTS had stolen these firearms, and that **CHANCE DEAKIN** assisted in the theft. In August 2017, Male B questioned **CHANCE DEAKIN** about the theft. Although CHANCE DEAKIN denied being personally involved in the theft, he acknowledged that STERLING ROBERTS did in fact steal the guns. According to **CHANCE DEAKIN**, STERLING ROBERTS brought the guns to the **SUBJECT PREMISES** after the theft. Based on this information, as well as the information provided by JAMES HARMON and Female C, it appears that STERLING ROBERTS previously stored weapons at the **SUBJECT PREMISES**. As such, it is reasonable to believe that weapons previously utilized by STERLING ROBERTS may be located at the **SUBJECT PREMISES**.

## Cellular Telephone and Computer Media

73. Based on my training and experience, I know that individuals involved in stalking, weapons, and related offenses often utilize computer devices (to include desktop computers, laptops, cellular telephones, iPads, and tablets) to plan, execute, and conceal various aspects of these offenses. In my experience, subjects involved in such offenses often conduct various Internet research related to the crimes on such devices, including but not limited to: (1) the locations of the criminal activities, (2) directions to the locations of the criminal activities, (3) information about the victims (which may be obtained by reviewing their social media accounts),

43

and (4) best practices or tips in executing the activities. Subjects may also use the Internet when conducting online purchases for instrumentalities used in the commission of the crimes, such as telephones and firearms. Individuals commonly conduct such Internet research on their computer devices (to include desktop computers, laptops, cellular telephones, iPads, and tablets).

74.    As detailed above, the examination of the cellular telephone seized from TAWNNEY CALDWELL on October 3, 2017 identified that she had telephone numbers saved in her phone for **CHRISTOPHER ROBERTS**, **CHANCE DEAKIN**, CHANDRA HARMON, and JAMES HARMON. Based on this information, it appears that TAWNNEY CALDWELL communicated with her co-conspirators via telephone. Based on my training and experience, I know that individuals communicate with co-conspirators via a variety of means, to include telephone, email, and messenger applications available on social media websites. These communications may contain material information related to the planning, execution, and concealment of the criminal activities and the instrumentalities used in the execution of the crimes. I know that individuals commonly use computer devices (to include desktop computers, laptops, cellular telephones, iPads, and tablets) to send these types of communications. Data from text messages, email messages, and messenger applications can often be recovered during forensic examinations of computer devices.

75.    Again based on my training and experience, I know that individuals often utilize cellular telephones and digital cameras to take pictures and videos. In my experience, subjects of criminal investigations have produced photographs and video recordings that captured instrumentalities of criminal offenses and shared these files with others via a variety of means. For example, I have been involved in investigations where individuals have photographed themselves holding firearms. Also for example, I know that individuals sometimes photograph

44

themselves holding their cellular telephones, and these telephones sometimes are the same ones used in the commission of criminal offenses.

76.     Again based on my training and experience, I know that individuals sometimes transfer the images and videos they take via their cellular telephones and other digital cameras to their computer devices for long-term storage.  These photographs sometimes include the ones described above that capture instrumentalities of criminal offenses.

77.     I also know, based on my training and experience, that cellular telephones, iPads, and tablets sometimes store GPS data and other location information on the devices.  Such GPS data and location information are materially relevant in cases involving stalking, weapons, and other related offenses in that it helps to identify where the subjects were when the alleged criminal offenses transpired.

78.     Based on my training and experience, I know that individuals sometimes backup their cellular telephones onto their desktop computers and tablets.  In my experience, the forensic examinations of desktop computers and laptops can often recover the telephone data that is backed up onto these devices.

79.     Based on my training and experience, I know that individuals often utilize desktop computers, laptop computers, and other smaller devices such as cellular telephones, iPads, and tablets to do their computing.  These devices are typically maintained in the owners' residences.  Due to their portable nature, individuals also sometimes maintain their cellular telephones, iPads, and tablets on their persons and/or take the devices with them when they travel by vehicle.

80.     Based on the information noted in the Affidavit, there is probable cause to believe that the computers, laptops, cellular telephones, iPads, and tablets contain evidence of the

stalking, weapons, and other offenses being investigated.  There is also probable cause to believe that these devices are located at the **SUBJECT PREMISES**, on the person of **CHANCE DEAKIN**, and on the person of **CHRISTOPHER ROBERTS**.

<u>Computers, Electronic Storage, and Forensic Analysis</u>

81.    As described above and in Attachments B-1 through B-3, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES** or on the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS**, in whatever form they are found.  One form in which the records might be found is data stored on a hard drive or other storage media of computer devices (to include desktop computers, laptops, cellular telephones, iPads, tablets, and digital cameras).  Thus, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

82.    *Probable cause.*  I submit that if computer devices (to include desktop computers, laptops, cellular telephones, iPads, tablets, and digital cameras) are found on the **SUBJECT PREMISES** or on the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS**, there is probable cause to believe those records will be stored on those devices, for at least the following reasons:

    a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

83.  *Forensic evidence.* As further described in Attachments B-1 through B-3, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on storage medium of computer devices (to include desktop computers, laptops, cellular telephones, iPads, tablets, and digital cameras) in the **SUBJECT PREMISES** or on the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

47

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in

advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

84.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware

and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

85.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

86.     The warrants I am applying for seek permission to seize particular computer devices – namely, desktop computers, laptops, cellular telephones, iPads, tablets, and digital cameras.  Based on my training and experience, I know that other electronic storage devices such as thumb drives, external hard drives, CD's, DVD's, and SD cards are sometimes attached to these items.  Such storage devices sometimes contain software or programs that may impact how the computer operates.  The storage devices also sometimes are used to save files viewed and/or created on the computer devices.  Based on this information, it is requested that any external storage devices attached to the desktop computers, laptops, cellular telephones, iPads, tablets, and digital cameras also be seized.

## CONCLUSION

87.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of such criminal offenses may be located at the **SUBJECT PREMISES,** on the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS**, and on the computers located at the **SUBJECT PREMISES** and on the persons of **CHANCE DEAKIN** and **CHRISTOPHER ROBERTS,** in violation of 18 U.S.C. §§ 2, 371, 373, 922(d), 922(g), 924(c), 1071, 1073, 1512, and 2261A.

88.     I, therefore, respectfully request that the attached warrants be issued authorizing the search and seizure of the items listed in Attachments B-1 through B-3.

Respectfully submitted,

Andrea R. Kinzig
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on
February 27, 2018

MICHAEL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

51